UNITED STATES, Appellee,

v.

Major David P. SCHNEIDER,
083–38–5785, United States
Army, Appellant.

ACMR 9003419.

U.S. Army Court of Military Review.

31 Jan. 1992.

For Appellant: David M. Lewis, Jr. (argued), Captain Holly K. Desmarais, JAGC (on brief).

For Appellee: Captain Samuel J. Smith, Jr., JAGC (argued), Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Kenneth T. Grant, JAGC (on brief).

Before De GIULIO, HAESSIG and ARKOW, Appellate Military Judges.

## OPINION OF THE COURT

De GIULIO, Senior Judge:

Appellant was tried by general court-martial for attempted murder of his wife and two specifications of conduct unbecoming an officer and a gentleman by committing perjury and by having sexual intercourse with and otherwise engaging in a sexual or other improper affair with a woman not his wife in violation of Articles 80 and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 880 and 933 (1982) [hereinafter UCMJ]. Contrary to his pleas, a court consisting of officer members found him guilty and sentenced him to dismissal, confinement for twenty-three years, and total forfeitures. The convening authority approved the sentence except that he conditionally suspended the forfeiture in excess of $400.00 pay per month until execution of the dismissal.[1]

Appellant asserts several errors which we find to be without merit. We affirm the findings of guilty and the sentence.

This is a case where the offenses were motivated by love and money. In 1987,

---

1. The suspended forfeiture is the subject of an assignment of error and will be discussed in this opinion.

appellant was assigned to the Lawrence Livermore National Laboratory in California. He moved to the area with his wife and two children. While working at the laboratory, he met Paula, with whom he worked for a time on a daily basis. In August 1987, Paula's friends asked Paula, the appellant, and appellant's family to accompany them on a boat trip. Appellant indicated that his wife and children would not go because his wife feared for the safety of the children but, if permitted, he would go. During the boat trip which lasted overnight, appellant and Paula shared adjoining quarters at the opposite end of the boat from where the other passengers were quartered. In April of 1989, according to Paula, her relationship with appellant became sexual and intimate.[2]

In July 1989, appellant told his wife that he had to go on a mission for the laboratory; but, due to its classified nature, he could not tell her of its location, other details, or point of contact for emergencies. In fact, appellant and Paula traveled to Hawaii where they stayed together in the King Kamehameha Hotel, Kailua, Hawaii.

In 1989, appellant was assigned to attend the U.S. Army Command and General Staff College, Fort Leavenworth, Kansas. At Fort Leavenworth, he moved his family into government quarters. In August 1989, he met with an insurance agent. Although the agent recommended appellant increase insurance coverage on himself, appellant declined to do so but stated he wanted an additional $150,000 coverage on his wife, Debbie. This policy, with appellant as the beneficiary, was effective 1 October 1989.

In the fall of 1989, appellant purchased a home in Tracey, California. He convinced Debbie that her name should not be on the title. He used the proceeds from the sale of the family home near his prior assignment for the purchase of this house. He told her that he had to go to California to take care of details of this purchase over

Labor Day weekend of 1989. He spent that weekend with Paula. Paula told a friend that it was the best weekend of her life.

Numerous telephone calls were made between appellant at Fort Leavenworth and Paula in California.

After returning home from a party on the evening of 20 October 1989, Debbie went to bed and fell asleep. She awoke with intense pain in her head and was pulled up to a sitting position on the bed. She saw appellant standing next to the bed. The toilet tank lid from the bathroom was on the floor near his feet. The toilet tank lid was broken. She felt a baseball-sized lump on her head. The lump was "oozing." She brushed small pieces of porcelain from her hair. She described appellant, who was normally calm and cool in time of crisis, as visibly shaken. He stated repeatedly, "you must have hit your head." Appellant assisted her to the bathroom where she sat on the toilet. When she began shaking, he helped her to the bathroom floor and covered her with a quilt. He wanted to take her for medical attention but she wanted only to go back to bed. He assisted her to the bed. The next morning, he took her to the medical facility. When asked what had happened to her head, appellant stated to medical personnel that Debbie was sleepwalking, picked up the toilet tank lid, tripped, and hit her head. The statement that she was injured while sleepwalking was recorded on medical documents. Evidence of record indicates appellant's wife had never walked in her sleep. When she returned home, Debbie found small pieces of the toilet tank lid on her pillow. This incident was the subject of the specification alleging attempted murder.

On 28 October 1989, appellant took his wife for a "romantic" overnight stay in a local downtown hotel. The room was on the top floor. After dinner he tried to get her to drink more champagne than she normally consumed. After they went to

2. Paula did not testify at the court-martial because she could not be found. Her prior testimony at appellant's state criminal trial was admitted into evidence. It is evident from that testimony that she was reluctant to testify and had refused to talk to prosecutors before she testified.

their room, appellant tried to get her out on the balcony. She refused because it was too cold and because she was afraid of heights.

On 4 November 1989, appellant and his wife were to attend the Armor Ball. Without her knowledge, appellant made arrangements for another "romantic" night at Embassy Suites Hotel. She discovered his plans when the babysitter told him she could not stay overnight. Appellant decided to go to the hotel after the ball anyway but to return home early. At the ball Debbie enjoyed the dancing and only left early to go to the hotel at appellant's insistence. Although appellant had asked for an eighth floor room when making reservations, he was given a room on the seventh floor.

Two sixteen-year-old girls, Chantel and Brandi, who were on the eighth floor, observed appellant and his wife when they entered the hotel. They were attracted to the couple because of their "extravagant attire." They watched appellant and his wife ride the glass elevator to the eighth floor and watched them walk side by side down the hallway. Brandi looked away. Chantel saw appellant make vigorous hand movements in front of his wife as she faced him with her back to the rail. She observed appellant put his left arm around Debbie where the rail met her back, put his right hand on her chest, and flip her over the rail. Chantel watched Debbie plunge 70–80 feet and hit a table on the atrium floor.[3] Chantel watched appellant look over the railing, walk toward the elevator, walk back to the railing and call for someone to call an ambulance. He then walked back to the elevator and proceeded down. Testimony indicates that appellant's conduct when he reached the atrium floor can be described as cool and collected. Debbie's pelvis was fractured in thirteen places. Both left and right femurs were broken in several places, with one bone

penetrating her abdominal cavity, damaging her colon. She also had a fractured ankle and a fractured rib. Her colon injury required a temporary colostomy. While his wife was being wheeled into the operating room, he asked the doctor to give her a "tummy tuck." Debbie's roommate at the hospital and the roommate's mother described appellant's attitude toward his wife while she was hospitalized as cool and distant. He was also described as a "jerk" in his attitude toward his wife.

On 2 December 1989, Debbie returned home from the hospital confined to a wheelchair. On 4 December, appellant told her that he didn't love her anymore and was getting a divorce. On 5 December, in an interview with local police, appellant admitted having an affair with Paula, stated he loved her and hoped to marry her when his divorce was final. On 6 December, appellant filed for divorce. Later, appellant was charged by local authorities with first degree assault for the incident at the Embassy Suites Hotel on 4 November. On 18 December, appellant moved to have his petition for divorce dismissed.

At his trial for attempted murder in state court, appellant testified that, at the Embassy Suites Hotel, they mistakenly went to the eighth floor.[4] He told his wife that he wanted to carry her across the threshold. He picked her up and was carrying her at high port when she told him they were in the wrong place. He turned and in doing so tripped. His wife slipped from his grasp, causing her to fall over the balcony railing to the atrium floor.[5] He testified that he did not intend to injure his wife. Appellant was acquitted of this offense in the state court.

At the state trial, appellant also testified regarding the October toilet tank lid incident. He stated that his wife went to bed, and he stayed up to do his school homework. Before he went to bed, he noted the toilet was running. He removed the tank

---

**3.** Debbie has no memory of this event from the time she entered the hotel.

**4.** Appellant did not testify at his court-martial. His testimony at his trial in civilian court was properly admitted into evidence.

**5.** It is this part of his testimony which is the subject of the perjury allegation as conduct unbecoming an officer in this court-martial.

lid and set it down against the cabinet. He fixed the toilet but decided to leave the tank lid off. He then went to bed and to sleep. He was awakened by a motion on the bed or noise. His wife was sitting on the bed, moaning, with her hand to her head. He got up to go to her but stepped on something. When he turned on the light, he discovered it to be "shards of obviously pieces of the toilet tank lid." She complained her head hurt, but upon his inquiry stated she didn't know what had happened. He stated that it was clear to him that she had hurt herself somehow. He helped her to the bathroom where she started to go into shock. He sat her on the toilet and turned on the faucet in the tub, in case he needed water. He then wrapped her in a blanket and checked to see if she could discern the number of fingers he held before her. He wanted to take her to the hospital but she refused. He concluded she did not have a fracture, gave her aspirin, and took her to bed. He testified at his state trial that he told personnel at the hospital that, "She was probably sleepwalking. I don't know or words to that effect." He testified, "I don't believe I would have told them she was sleepwalking, 'cause Debbie has never sleptwalked, and so I wouldn't say that."

## I.

■ Appellant alleges that the military judge erred in denying a mistrial based on an officer junior in rank to appellant having participated in deliberations on findings.

Appellant's date of rank is 1 April 1989. The Officer Record Brief (ORB) of one of the court members, Major H, incorrectly reflects her date of rank to be 1 March 1989. In a response to a questionnaire provided all court members, Major H indicated that her date of rank was 1 March 1990. Both the ORB and the responses to the questionnaire had been provided appellant's counsel prior to voir dire. Appel-

lant's counsel discovered the discrepancy while the court was deliberating on findings. They elected not to raise the issue, however, until after the findings were announced. Indicating that he believed the matter was intentionally not brought to his attention until after findings unfavorable to appellant were announced, the military judge denied the motion for a mistrial, based upon waiver. He did, after confirming the member was junior to appellant, grant a challenge for cause to the member's further participation during the sentencing phase of the trial.

■ That a member of the court is junior in grade or rank to the accused is a ground for challenge or removal for cause. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 912(f)(1)(K) [hereinafter R.C.M.].[6] The challenge should be made after voir dire or at any other time during trial when it becomes apparent that a ground for challenge may exist. R.C.M. 912(f)(2)(A) and (B). It is not a jurisdictional defect where a member of a court-martial is junior in rank or grade to an accused. *United States v. McGee*, 15 M.J. 1004 (N.M.C.R.1983). Failure to challenge for cause or object where a court-member is junior to an accused waives the defect. R.C.M. 912(f)(4); *United States v. Wilson*, 21 M.J. 193 (C.M.A.1986); *McGee*, 15 M.J. at 1006.

In the case before us, we find that the defense was provided the documents containing the information which was the basis for a challenge for cause. Due diligence would have disclosed that information. Indeed, members of the defense team discovered the evidence while the court was deliberating on findings and made the decision not to object until after findings were announced. Under these circumstances, we hold appellant waived any objection to the court member who was junior in rank or grade to him.[7] The military judge properly denied the motion for a mistrial.

---

6. Article 25(d)(1), UCMJ, 10 U.S.C. § 825(d)(1), provides, "When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade."

7. We need not determine if the waiver also applied to the sentencing procedure because the military judge granted a challenge by defense to Major H's further participation in the case.

## II.

■ Appellant contends that the military judge erred in denying a motion to sever the offenses of attempted murder and perjury. He contends that it is unlikely that appellant would have been found guilty of attempted murder had the perjury offense not been joined. He contends the spillover effect of the Embassy Suites Hotel incident had a tendency to influence the members unduly for the attempted murder offense. He further argues that without the perjury specification, the prejudicial effect outweighs the probative value of the evidence. We disagree with this argument.

■ As a general rule in military practice, all known offenses are tried at a single trial. *See* R.C.M. 601(e)(2) (all known charges should be referred to a single court-martial). *See also* R.C.M. 906(b)(10) discussion ("Ordinarily, all known charges should be tried at a single court-martial"). It is true, however, that specifications may be severed to prevent a manifest injustice. R.C.M. 906(f)(10). Depending upon the facts presented in a case, a spillover of the evidence may make it impossible for a rational fact finder to separate the evidence of one specification from the other. *United States v. Haye*, 29 M.J. 213, 214 (C.M.A. 1989). The test to be applied is whether the evidence presented as to one would be independently admissible to prove the other. *Id.* at 215. Further, a limiting instruction may prevent prejudice. *United States v. Hogan*, 20 M.J. 71, 73 (C.M.A.1985).[8]

In the case *sub judice*, the 4 November incident involving the evidence on the perjury specification was admissible under Mil. R.Evid. 404(b) as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The military judge gave the court a limiting instruction on the use of the evidence of the 4 November incident. We hold therefore that there was no "spillover effect" of the evidence. We find, as did the military judge, that the probative value of the evidence is not substantially out-

weighed by the danger of unfair prejudice. *See* Mil.R.Evid. 403. The military judge properly denied the motion to sever the offenses.

## III.

■ Next, appellant contends that the military judge erred by denying a motion to dismiss the specification of perjury because it violated appellant's right against double jeopardy. Appellant's argument is that his testimony in his state court trial went to the heart of the issue of the offense for which he was tried and was determined favorable to him. Thus, he argues, the government is collaterally estopped from charging appellant with perjury for his testimony. We do not agree with appellant that double jeopardy applies here.

■ The doctrine of collateral estoppel has not been applied in military criminal law. *United States v. Cuellar*, 27 M.J. 50 (C.M.A.1988), *cert. denied*, 493 U.S. 811, 110 S.Ct. 54, 107 L.Ed.2d 23 (1989). We see no reason to apply it here. Additionally, prosecution of an offense in state court does not normally bar a federal prosecution of the same criminal matter. *Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *United States v. Lanza*, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922). We find no merit in this assertion of error.

## IV.

■ Appellant also asserts that the evidence is legally insufficient to support the finding of guilty of attempted murder and factually insufficient to support the findings of guilty of all offenses. The test for legal sufficiency is whether a reasonable fact finder, viewing the evidence in a light most favorable to the government, could have found all the essential elements of the charged offense. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Applying this test, we find the

---

**8.** In both *Hogan* and *Haye* offenses involving the questioned evidence were dismissed. This is

not the case before us.

evidence legally sufficient to support the finding of guilty of attempted murder. Although not challenged by appellant, we also find the evidence legally sufficient to support the findings of guilty to the two offenses of conduct unbecoming an officer and a gentleman.

■ The test for factual sufficiency of the evidence is whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of appellant's guilt of the offenses. *See* UCMJ art. 66(c), 10 U.S.C. § 866(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). Applying this test, we are convinced beyond a reasonable doubt of appellant's guilt of all of the offenses.

### V.

■ Finally, appellant alleges that the convening authority's action imposed illegal and unenforceable conditions on the suspension of forfeitures. Appellant was sentenced, *inter alia,* to forfeiture of all pay and allowances. In his post-trial submissions to the convening authority, appellant requested assistance in supporting his dependents. The convening authority's action provided in pertinent part,

> However, the execution of that part of the sentence extending to forfeiture of all pay and allowances in excess of $400.00 per month is suspended until the execution of that part of the sentence extending to a dismissal from the service, at which time, unless the suspension is sooner vacated, the suspended part of the sentence will be remitted without further action, this suspension being on the conditions that the accused continuously claim on an Internal Revenue Service Form W-4, so long as he may legitimately do so, that he is single with two dependents, and that he initiate and maintain a monthly military pay allotment to be paid directly to Deborah A. Schneider

in the amount of $2500.00. The remainder of the sentence, except for that part of the sentence extending to a dismissal from the service, will be executed.

Subsequently, in a divorce decree, a state court ordered an amount less than that provided by the convening authority's action be paid for support and maintenance for Debbie and appellant's children. Appellant then requested the convening authority either eliminate the terms of suspension or revise them to conform to the state court requirements. The convening authority denied appellant's request.

Appellant maintains that the convening authority ignored the determination of a court of competent jurisdiction regarding the appropriate level of family support and maintenance where both parties were represented by counsel. Appellant reasons that he, "by no stretch of reasoning, agreed to pay an amount in excess of that which was ultimately judged fair and reasonable by such court" and that "the terms of the suspension represent an overreaching...." [9]

■ This Court has held a convening authority can impose a suspension of forfeitures contingent upon initiating and maintaining an allotment for support and may name a recipient for the allotment.[10] *United States v. Cowan*, 32 M.J. 1041 (A.C.M.R.1991). The convening authority's action is based upon federal statute, and his action in approving a court-martial sentence is within his sole discretion. *See* UCMJ art. 60(c), 10 U.S.C. § 860(c). It is separate from and can be taken without regard to a state court civil action. We hold the convening authority can properly approve a suspended forfeiture, the conditions of which are more stringent than the support and maintenance requirements of a state court. The allegation of error is without merit.

---

9. Except in cases involving pretrial agreements, an accused's agreement to a sentence has little play in the convening authority's determination of the sentence to be approved in his action. Seldom does an accused agree to his approved sentence.

10. Although we continue to believe this is unwise, a convening authority is not precluded from such action. *See United States v. Cowan,* 32 M.J. at 1042, n. 1.

We have examined the assertions of error personally raised by appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982) and find them also to be without merit.

The findings of guilty and the sentence are affirmed.

Judge HAESSIG and Judge ARKOW concur.